UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Docket no. 2:15-cr-175-GZS |
| JOEL A. SABEAN, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is the Motion to Suppress Statements of Defendant (ECF No. 27). The Court held an evidentiary hearing on this Motion on September 29, 2016. For reasons explained herein, the Court now DENIES the Motion to Suppress.

**I.    LEGAL STANDARD**

The Citizens Protection Act provides that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a) (the "McDade Amendment"). The District of Maine has adopted the Maine Rules of Professional Conduct as the rules that govern attorneys who appear before the court. See D. Me. Local Rule 83.3(d). Thus, under the McDade Amendment, the District of Maine's Local Rules, and Rule 4.2(a) of the Maine Rules of Professional Conduct, "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Me. Rules

of Prof. Conduct 4.2(a). In this case, Defendant alleges that a violation of this rule (hereinafter, a "McDade no-contact violation") occurred when agents for the Government interviewed him on January 29, 2014 knowing that he was represented by counsel but without first obtaining the consent of his counsel. Defendant further asserts that this McDade no-contact violation amounted to a violation of his Fifth Amendment due process rights and that the Court must therefore suppress the statements he made during the January 29th interview.

United States v. De La Cruz, No. 14-2132, 2016 WL 4410063 (1st Cir. Aug. 19, 2016) is a useful starting point in analyzing Defendant's rather novel argument. In De La Cruz, the First Circuit explained:

> 'Suppression of evidence is strong medicine, not to be dispensed casually.' United States v. Adams, 740 F.3d 40, 43 (1st Cir.), cert. denied, ––– U.S. –––, 134 S. Ct. 2739 (2014). Normally, a violation of federal or state law triggers the exclusionary rule only if the evidence sought to be excluded 'ar[ises] directly out of statutory violations that implicate[ ] important Fourth and Fifth Amendment interests.' Sanchez–Llamas v. Oregon, 548 U.S. 331, 348 (2006); see United States v. Caceres, 440 U.S. 741, 751–55 (1979). As a result, '[t]he cases in which the Supreme Court has approved a suppression remedy for statutory violations are hen's-teeth rare.' Adams, 740 F.3d at 43.

2016 WL 4410063, at *4 (internal footnote omitted). In De La Cruz, the First Circuit went on to hold that "failure to obtain an administrative arrest warrant" as required by federal statute could not alone justify the suppression of evidence. See id. at *4.

Against this backdrop, the Court must determine whether the preponderance of the evidence establishes that a McDade no-contact violation occurred on January 29, 2014.[1] Additionally, the Court must consider whether to exercise its discretion to suppress evidence obtained as the result of any proven McDade no-contact violation.

---

[1] At the hearing, the parties appeared to agree that the burden of proof was on the Government and the hearing proceeded on that joint assumption. The Court notes that who the factual findings made in this Order would remain the same even if the burden were placed on Defendant.

## II.   FACTUAL FINDINGS

On the afternoon of January 15, 2014, IRS Special Agent Cordier ("SA Cordier") traveled with Special Agent Jason Rogers to serve a grand jury subpoena for documents on PK Associates, a bookkeeping company owned by Patricia and Raymond Kuhl. They arrived at the Kuhls' residence at approximately 4:30 p.m. The agents proceeded to explain that they were conducting an investigation of Dr. Sabean and had questions for the Kuhls in this regard. Approximately two hours into this interview, around 6:30 p.m., SA Cordier had IRS Special Agent Margo Fitzgerald ("SA Fitzgerald"), who was the lead agent on the Sabean investigation, join the interview by phone. During the course of the interview, the Kuhls were asked not to contact Dr. Sabean or any other person and were shown a similar request contained in the written subpoena. (Gov't Ex. 2 at GJ064-0005.) Patricia Kuhl was left with the impression that she was not allowed to contact Dr. Sabean or any other person about this subpoena.[2] The agents did not explicitly ask and were not explicitly told that Dr. Sabean presently had an attorney who represented him on tax matters.[3] Ultimately, SA Cordier took "a six-inch stack" of records from the Kuhls that were deemed initially responsive to the subpoena when the January 15, 2014 interview concluded.

On January 16, 2014, SA Cordier reviewed documents she had taken from the Kuhls' residence. Upon review, SA Cordier determined that there might be attorney-client privileged information within the documents and requested a "filter AUSA" through SA Fitzgerald so that documents might be reviewed for attorney-client privilege. Emails from SA Fitzgerald to

---

[2] To the extent the agents and Patricia Kuhl gave differing testimony on exactly what was said on this point, the Court finds the agents' testimony more credible. Nonetheless, Patricia Kuhl's recollection and impression appear to reflect her genuine belief regarding what she needed to do to comply with the subpoena and the directions she received from the agents.

[3] The Court credits the testimony of the agents and their contemporaneous notes over the differing testimony offered by Patricia Kuhl on this point. See Gov't Exs. 4A & 4B.

3

Assistant United States Attorney Joyce on January 16, 2014, reflect that SA Fitzgerald was aware by this date of the existence of privileged materials and the existence of records from a private investigator, who was, at the time, described as "hired" by Sabean "[a]t the behest of the Kuhls" "to follow [Shannon Sabean] around" during the 2010-2012 time frame. (Def. Exs. 6 & 7.)

SA Fitzgerald also spoke with Patricia and Raymond Kuhl by phone on January 16, 2014. During this phone call, SA Fitzgerald and the Kuhls discussed the logistics of obtaining records responsive to the grand jury subpoena served upon PK Associates, as well as matters relating to a loan, the payment of financial obligations, and Dr. Sabean's mother.

On January 17, 2014, SA Fitzgerald again spoke with Patricia Kuhl. During this call, Patricia Kuhl told SA Fitzgerald that she had not had contact with Joel Sabean or anyone working on his behalf. SA Fitzgerald told Kuhl to call her if any such contact occurred. (Def. Ex. 8.) By this point, SA Fitzgerald was aware that Attorney Michael Sheehan was potentially involved in the hiring of the private investigator in Florida, known as Sheer Investigations.

On January 21, 2014, SA Fitzgerald, accompanied by IRS Special Agent Pepin ("SA Pepin"), conducted another interview of Patricia and Raymond Kuhl at the Kuhls' residence. SA Fitzgerald also brought boxes to the Kuhls' residence in which to pack documents responsive to the subpoena. During this interview, the Kuhls raised issues regarding the private investigator and attorney-client privilege. At that time, Attorney Sheehan was explicitly discussed in connection with attorney-client privilege and the hiring of Sheer Investigations. The Kuhls were asked to segregate materials that might be subject to attorney-client privilege during this meeting. (Def. Exs. 10 & 11.)

By January 27, 2014, PK Associates completed its production of documents in response to the subpoena. The production consisted of forty-two boxes of documents and a flash drive.

Patricia Kuhl had segregated some of the documents and marked them as privileged. The produced documents were reviewed for attorney-client privilege by an assembled taint team, which ultimately produced a 59-page privilege log. (See Ex. C (ECF No. 27-3).)

On January 29, 2014, SA Fitzgerald and IRS Special Agent Coviello traveled to the offices of Dr. Sabean in South Portland. SA Fitzgerald came to the interview with a prepared outline that included, in relevant part, the following questions: "Who is SHEER and Associates? Sheer Investigations? What are these payments for? What was result? Consent to obtain these files?" (Def. Ex. 12 at R022-0012.02.) SA Fitzgerald did not advise Dr. Sabean of any non-custodial rights pursuant to directions she received from AUSA Joyce and consistent with her understanding that grand jury proceedings were not subject to otherwise applicable procedures contained in the IRS Manual.

At the interview, Dr. Sabean signed a waiver that read as follows:

> I specifically waive any rights or privileges I have in relation to any and all results of the Private Investigator Sheer and Associates or Sheer Investigations. I understand I am under no obligation to waive these rights, and I do so without any promises given to me by IRS investigators. I understand there might exist an attorney/client privilege and I specifically waive that right.

(Def. Ex. 13.) SA Fitzgerald handwrote this waiver during the interview because she was operating under the assumption that Sheer Investigations materials were subject to attorney-client privilege but now anticipated that Dr. Sabean was willing to show agents videos that had been made by Sheer Investigations. After this interview of Dr. Sabean was completed, SA Fitzgerald called Patricia Kuhl and informed her that Dr. Sabean was now aware of the investigation. Patricia Kuhl then believed she could contact Dr. Sabean and Attorney Sheehan and reached out to both of them.

Dr. Sabean had retained Attorney Sheehan to represent him on tax matters in November 2009. As part of this representation, Attorney Sheehan had retained Sheer Investigations, which

conducted surveillance of Shannon Sabean. In fact, Attorney Sheehan had communicated with Patricia Kuhl regarding his ongoing representation of Dr. Sabean during the week of January 13, 2014. On January 29, 2014, in response to the phone call from Patricia Kuhl informing him of the IRS investigation, Attorney Sheehan contacted SA Fitzgerald and AUSA Joyce to inform them that he represented Dr. Sabean and that they should direct further communications regarding their investigation to him. The Government subsequently attempted to serve a grand jury subpoena for documents on Sheer Investigations. (See Ex. K (ECF No. 27-11).) Dr. Sabean moved to quash that subpoena and that motion was granted upon the magistrate judge's finding that the Sheer Investigation documents were subject to protection as the work product of Attorney Sheehan.

## III. DISCUSSION

Notably, the Government has made two concessions in response to the Motion to Suppress: (1) "The Government does not intend to offer any evidence relating to Dr. Sabean's statements made during the January 29 interview about the Sheer and Associates investigation in its case-in-chief." (2) "The Government also does not intend to seek enforcement of the handwritten waiver form that was signed by Dr. Sabean during the interview." (Gov't Response at 10.)

Even with those two concessions, the pending Motion requires the Court to determine if there was a McDade no-contact violation and also whether exclusion of statements obtained from Dr. Sabean would be the appropriate remedy for any such violation.

### A. The January 29, 2014 Interview of Dr. Sabean complied with the requirements of the McDade Amendment and Rule 4.2 because it was contact authorized by law.

On the record presented, the Court finds that the Government knew that Dr. Sabean was represented in connection with at least some of the matters being investigated as of January 29, 2014. Specifically, it is apparent that the matters being investigated included Sheer Investigations

and medical deductions taken by Dr. Sabean for expenses incurred by Shannon Sabean. While the Court heard some dueling accounts of the substance of the conversations that took place between the agents and the Kuhls prior to January 29, 2014, the Court's conclusion does not rest solely on the credibility of any particular testimony or any particular witness' recollection of the conversations. Rather, the documents in the record, combined with the preponderance of the credible testimony, provide sufficient support for a finding that the Government knew or had reason to know by January 29, 2014 that Dr. Sabean was represented in connection with the matter being investigated. See Maine Rule of Prof. Conduct. 4.2, cmt. 8 (noting that "actual knowledge may be inferred from the circumstances" and that counsel "cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious").

Having found that the Government knew that Dr. Sabean was represented by Attorney Sheehan in connection with at least some of the matters under investigation, the Court still must consider the Government's argument that the contact was authorized by law. On the record presented, and despite Defendant's argument to the contrary, the Court concludes that the overt, preindictment, noncustodial interview of Dr. Sabean was authorized by law.

The Court recognizes that Maine now has adopted the "person" rather than "party" version of the no-contact rule.[4] The accompanying comments and reporter's notes to Maine's no-contact rule nonetheless suggest that the type of activities undertaken here fall under the "authorized by law" exception. First, Comment 5 to Rule 4.2 notes:

> Communications authorized by law may also include investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings. When communicating with the accused in a criminal matter, a government lawyer must

---

[4] The Reporter's Notes make it clear that this choice was an intentional one: "The Task Force considered whether the application of this rule to a 'person' as opposed to a 'party' was overbroad, particularly in the context of law enforcement activities. The consensus of the Task Force was that it was not." Me. Rules Prof. Conduct 4.2 Reporter's Notes.

7

> comply with this Rule in addition to honoring the constitutional rights of the accused. The fact that a communication does not violate a state or federal constitutional right is insufficient to establish that the communication is permissible under this Rule.

Me. Rule of Prof. Conduct 4.2, cmt. 5. In the Court's view, the only reading of this just-quoted portion of Comment 5 that reconciles the first-quoted sentence with the latter two sentences is that the prohibition on contact begins when there is an "accused," thereby marking the actual commencement of criminal proceedings. Likewise, the Reporter's Notes for Rule 4.2 explain:

> Traditional investigative activities of prosecutors are those 'authorized . . . by law.' And this rule is not intended to affect or change present substantive law or practice. However, formal notifications, such as written proffers, to persons known to be represented outside of that context have no legitimate reason to be directed so as to avoid the person's lawyer.

Me. Rule of Prof. Conduct 4.2 Reporter's Notes. When the Maine Task Force wrote this note,[5] the "present substantive law or practice" was reflected in United States v. Tableman, No. Crim. 99-22-B, 1999 WL 1995192, at *2 (D. Me. Sept. 3,1999) (affirmed by district court on Oct. 5, 1999). In Tableman, the court concluded that an interview of a then-represented defendant conducted twenty-two months prior to the indictment fell within "an ordinary pre-indictment investigation" and within "the 'authorized by law' exemption" of the no-contact rule. See id. at *2 & n.4 (collecting cases).[6]

    Rule 4.2 and the notes and comments just discussed may require a government attorney to deem a case as having moved from an "investigative activities" phase to a criminal proceeding

---

[5] The Court notes that the Maine Rules of Professional Conduct became effective on August 1, 2009, approximately ten years after the McDade Amendment became effective.

[6] Likewise, the "present substantive law or practice" at the time of Rule 4.2's adoption included State v. McCarthy, 819 A.2d 335, 341 (Me. 2003). In McCarthy, the Maine Law Court has held that "suppression would not be the remedy [for a violation of the no-contact rule] absent an independent constitutional or statutory basis for the suppression of the evidence" and also refused to indicate that the no-contact rule had been violated by a prosecutor authorizing law enforcement to visit a represented person in jail who had asked to speak with them. See id. at 341 & n.3.

before a charging instrument is filed in certain cases. However, Rule 4.2's application to this record does not provide an occasion to resolve that issue. Here, the preponderance of the evidence supports the finding of traditional investigatory activities. This evidence includes the timeline. After the January 29, 2014 contact with Dr. Sabean, more than twenty months passed before an indictment was handed down on October 20, 2015. As the hearing record makes clear, no defense team had been assembled as of January 2014. As a result, Dr. Sabean had not had formulated anything like a trial strategy that the government agents could have attempted to unveil, even had they been inclined to do so. In short, Sabean was interviewed during the investigatory phase.

On similar records, the Court notes that multiple other courts have reached a similar conclusion. See e.g., United States v. Brown, 595 F.3d 498, 514-16 (3rd Cir. 2010) (affirming the denial of a motion to suppress because prosecutor's contact was authorized by law), cert. denied, 562 U.S. (2011); United States v. Grass, 239 F. Supp. 2d 535, 542 (M.D. Pa. 2003) ("[B]ecause AUSA [ ]'s conduct did not violate Defendants' constitutional rights, in addition to the fact that there is a significant body of caselaw indicating that such conduct is not prohibited by the no-contact rule, it must be that his conduct was 'authorized by law.'"); United States v. Joseph Binder Schweizer Emblem Co., 167 F. Supp. 2d 862, 866 (E.D.N.C. 2001) ("[N]o rule of professional conduct precludes pre-indictment contacts between the government and a represented party in a non-custodial setting especially in a case such as the one before the court in which the party connoted to the government that she was not represented by counsel."); In re Disciplinary Proceedings Regarding Doe, 876 F. Supp. 265, 268-69 (M.D. Fla. 1993) (collecting cases).

**B. Suppression is not an Appropriate Remedy for Defendant's Asserted McDade no-contact violation.**

The Supreme Court has recognized that due process rights may be implicated if "an individual has reasonably relied on agency regulations [or laws] promulgated for his guidance or

9

benefit and has suffered substantially because of their violation by the agency." United States v. Caceres, 440 U.S. 741, 752–53 (1979). However, Caceres endorsed a "case-by-case approach" rather than "a rigid exclusionary rule" for any such due process violations. Id. at 755-56. Likewise, in United States v. Hammad, 858 F.2d 834 (2d Cir. 1988), the Second Circuit recognized that courts have the discretion to suppress evidence based on a violation of ethical rules but warned that courts must "exercise their discretion cautiously and with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth." Id. at 842.

Both Caceres and Hammad were decided after the First Circuit's decision in United States v. Leahey, 434 F. 2d 7 (1st Cir. 1970).[7] In that case, the First Circuit indicated that "due process require[d]" IRS agents to follow IRS procedures to give certain Miranda-style warnings before beginning noncustodial interviews of taxpayers when those publically announced procedures were "designed to protect taxpayers by setting a clear and uniform standard governing the first contact between a Special Agent and a tax fraud suspect." Leahey, 434 F.2d at 10. Finding a due process violation on that basis, Leahey affirmed the grant of a motion to suppress. See id. at 11. In the Court's view, Leahey is distinguishable from this case in which the record makes clear that grand jury procedures preempted the application of any IRS procedures that might otherwise have been applicable.[8] In any event, the Court also reads Leahey as endorsing the view that while exclusion may be a remedy for due process violations of interview procedures, it is not a mandatory remedy.

---

[7] The First Circuit's Leahey decision was discussed and relied upon by the district court in United States v. Koerber, 966 F. Supp. 2d 1207 (D. Utah 2013), a case that Defendant argues supports his Motion to Suppress. See Def. Mot. at 9-13.

[8] Unlike the expressed concerns that animated Leahey, sanctions are available if and when government attorneys violate Maine's no-contact rule. See, e.g., State v. McCarthy, 819 A.2d at 341 (noting that violations of the no-contact rule would make attorneys "*personally* subject to the disciplinary jurisdiction of the Court").

Generally, most courts have determined that suppression must be reserved for only the most egregious violations of the no-contact rule and have declined to order suppression. See, e.g., United States v. Joel, No. 15-CR-430-GPC, 2015 WL 5704297, at *6 (S.D. Cal. Sept. 29, 2015) (stating that in the absence of a clear precedent in the circuit establishing that the contact in question was prohibited, exclusion of evidence would be "antithetical to the administration of justice" (internal quotation omitted)); United States v. Bowen, No. CRIM.A. 10-204, 2011 WL 1980281, at *1 (E.D. La. May 20, 2011) ("Even if the . . . statement was taken in violation of Rule 4.2, which issue the Court does not decide, suppression of the resulting evidence is not warranted under the circumstances presented here."); United States v. Beliveau, No. CRIM 09-304, 2010 WL 681257, at *5 (D. Minn. Feb. 23, 2010) (concluding that facts were not egregious enough to warrant suppression and noting that "nearly every court" that has ruled on a no-contact rule violation in a criminal law context has found that suppression of a statement is "an inappropriate remedy for a lawyer's ethical violation" (internal quotation omitted)); United States v. Carona, No. SA CR 06-224-AG, 2008 WL 1970218, at *8 (C.D. Cal. May 2, 2008) ("The court is aware of no criminal case where a communication with a government agent violating a [no-contact] rule . . . was suppressed, unless the communication also violated the Sixth Amendment."), aff'd, 630 F.3d 917 (9th Cir. 2011) & 660 F.3d 360 (9th Cir. 2011); see also United States v. Ryans, 903 F.2d 731, 737 (10th Cir. 1990) (explaining that the Tenth Circuit's decision to suppress evidence in an earlier case resulted from an infringement on the defendant's Sixth Amendment right to counsel, because the formal adversary process had already begun).

Defendant relies on the post-McDade Amendment decision in United States v. Koerber, 966 F. Supp. 2d 1207 (D. Utah 2013), where suppression was found to be the appropriate remedy

11

for a violation of the no-contact rule.[9]  In Koerber, the district court found that the government knew that the defendant was represented by counsel at the time that it conducted two *ex parte* interviews with him.  These interviews were conducted before the defendant was indicted, but the Koerber court found that the government's posture towards the defendant had already shifted from investigative to prosecutorial.  In the second interview, government agents used scripted questions that the court concluded were "designed to induce Defendant, who was the target of their investigation and whom prosecutors intended to indict, to waive attorney-client privilege and to reveal potential trial strategy . . . ."  Id. at 1214.  While acknowledging that courts have discretion as to the application of the exclusionary rule in connection with an agency rule violation, the Koerber court announced that, in its view, the defendant's due process rights were violated, and exclusion was therefore appropriate.  See id. at 1245.

In the Court's assessment, Koerber is an isolated, unusual case that is readily distinguishable from the facts found here.  Quite simply, the contact in this case does not reflect an egregious violation of the no-contact rule, as was found in Koerber.  As already discussed, the Government's posture was clearly still investigative at the time that Sabean was contacted, with no indication that an indictment of Sabean was imminent or even a foregone conclusion at the time of the contact.  While the Government was aware that Attorney Sheehan was involved with the hiring of Sheer Investigations, in the Koerber case, the Government knew that Mr. Koerber had retained a criminal defense attorney specifically to assist with the lengthy and ongoing government inquiry into Koerber's affairs, and Mr. Koerber referenced that attorney repeatedly in his

---

[9] Another case Defendant cited in his Motion and at oral argument in support of his argument that preindictment ex parte contacts are not authorized by law is United States v. Bowman, 277 F. Supp. 2d 1239 (N.D. Ala. 2003), vacated by No. CR-03-C-0056-E, 2003 WL 23272667, at *1 (N.D. Ala. Sept. 12, 2003).  Despite counsels' acknowledgement that this case was "vacated based on plea agreements," they continue to cite to the August 9, 2003 opinion as a reflection of persuasive authority.  Def. Mot. at 8-9; see also Def. Reply at 6.  To be clear, the Court views Bowman as "officially gone" and "void."  See United States v. Ellis, 419 F.3d 1189 (11th Cir. 2005) ("[V]acated opinions are officially gone.  They have no legal effect whatever.  They are void.")

interviews with investigators. See id. at 1218. Finally, while the government agents used a waiver form in their meeting with Sabean, the waiver was handwritten during the interview and addressed to a particular issue, i.e., Sheer Investigations. Thus, it does not seem to be a fair characterization of the evidence to say that the interview was scripted to reveal potential trial strategy or obtain an uncounseled confession.

Taken to its logical conclusion, Koerber's due process analysis could make any statutory violation into a violation of due process rights and thereby create a constitutional basis for excluding any and all evidence obtained in violation of the McDade Amendment, or any other statute. The First Circuit has recently confirmed in two separate cases that not every statutory violation has a "constitutional dimension" or is "[ ]tethered to the abridgment of constitutional rights." United States v. Adams, 740 F.3d 40, 43 (1st Cir. 2014) (declining to suppress evidence that was seized in an assumed violation of 26 U.S.C. § 7608), cert. denied, 134 S. Ct. 2739 (2014); see also De La Cruz, 2016 WL 4410063, at *4. Here, any McDade no-contact violation was untethered to a violation of Dr. Sabean's Fifth Amendment rights. On the totality of the record presented, it is apparent that Dr. Sabean's statements were made knowingly, intelligently, and voluntarily in the context of a preindictment, non-custodial interview, which took place at Defendant's place of business and at his convenience.[10] See, e.g., United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990) ("The burden rests with the government to prove voluntariness by a preponderance of the evidence.") (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)).

---

[10] While the Court makes a voluntariness finding, it notes that Defendant has not sought a determination of voluntariness as part of his Motion to Suppress. See Fed. R. Civ. P. 12(b)(3)(C); United States v. Casey, 825 F.3d 1, 21 (1st Cir. 2016) (noting that failure to timely raise the basis for a motion to suppress "constitutes waiver"); United States v. Mendoza-Acevedo, 950 F.2d 1, 3 (1st Cir. 1991) (finding voluntariness was waived as a basis for suppression).

Recognizing its apparent discretion to suppress evidence obtained as the result of a McDade no-contact violation, the Court concludes that this record does not present the "'hen's-teeth rare'" case where suppression of Defendant's otherwise voluntary statements is an appropriate remedy. De La Cruz, 2016 WL 4410063, at *4 (quoting Adams, 740 F.3d at 43).

### IV. CONCLUSION

For the reasons just given, the Motion to Suppress Statements of Defendant (ECF. No. 27) is hereby DENIED.  Given its concession regarding its case-in-chief, before the Government seeks to offer any evidence relating to Dr. Sabean's statements made during the January 29th interview about the Sheer Investigations in rebuttal, the Government shall inform the Court outside the presence of the jury in order to allow the Court to hear any renewed objections by Defendant.

SO ORDERED.

                                           /s/ George Z. Singal  
                                           United States District Judge

Dated this 3rd day of October, 2016.